Moses Benjamin, Esq., Cleveland, for plaintiff in error.

Joseph N. Ackerman, Esq., Cleveland, for defendant in error.

## SCHWARTZ v SCHWARTZ

Ohio Appeals, 8th Dist, Cuyahoga Co

Decided July 15, 1931

**VICKERY, J.**

I do not think that any member of the courts in Ohio has had more opportunity to pass upon this question than the writer of this opinion, as he has written several opinions upon this subject sometimes sustaining and sometimes refusing to sustain a common law marriage, and I think the writer of this opinion knows what is necessary in order to constitute a common law marriage. There are certain elements necessary to constitute such a marriage: there must be an agreement in praesenti to be to each other husband and wife, followed by cohabitation as such husband and wife. In two cases at least I have taken occasion to point out that where the relation started as illicit and an agreement was entered into afterwards, proof was required to overcome the presumption that the relation that had been commenced as illicit would continue and, therefore, it had to be overcome with more evidence.

However, that is not in this case, because in the instant case there is no evidence of any cohabitation at all that is worthy of credence. In the first place there was no agreement to live together as husband and wife. All that the defendant in error, the plaintiff below, claims, was that on March 15th Schwartz said to her: "Now I am your Hubby", and she said to him: "I am your Wifie." And she says that was followed by cohabitation, but she brings no proof of that; she does not say where that took place, nor when, nor is there a word of evidence in the whole record to corroborate her statement, and except for her naked word to all appearances one might quote Prospero in the Tempest, "Her virgin knot had never been untied." At least the defendant below, plaintiff in error here, denies that any sexual relation ever existed between them and there is nothing in the record save her unsupported word, to show that any such relation ever did take place between them. One wonders what an examination of a physician might bring forth in this connection, but there is no such evidence.

I apprehend, however, that from the gushing nature of her letters and her attitude throughout, Ann Louise was perfectly ready and willing to have sexual relations with this young man, and one does not have far to go to be able to say that in all probability he had such relations, but there is not one particle of proof except her word that such ever was the fact. It surely is not set up where, or when, or how this copulation took place. She says that he admitted it to her father. An examination of the father's testimony will show no such thing.

She further says that Schwartz introduced her or said something to a doctor. He denies it and there is no forthcoming testimony of the doctor, or of anyone else, that such conversation took place. So, after all, it is only her assertion against his.

Now, she relies upon the terms "Hubby" and "Wifie" that were used in these letters. Unfortunately for her the epithet, endearing or mushy, however one might look at it, was used immediately after their meeting

in October of 1927 and continued long before there was any marriage according to her own statement, and so one can dismiss the letters and the endearing terms used therein from the matter entirely.

That these young persons were attracted to each other and became attached to each other, is pretty manifest from the record. It is also manifest from the record that the young man was a medical student and dependent upon his father and mother for his support through the medical school, and one of the letters that was introduced in evidence which was written by her bears out what he says about it, that is, that they contemplated a marriage some time in the future, for in it she writes, "Your Wifie of 1931." That agrees with his version of this affair: that after he got through medical school they intended to get married and she and he undoubtedly were in a measure engaged.

She further talks about their "spiritual marriage", and she regarded themselves as being married in spirit late in 1927. Well, that would account for the endearing terms, but unfortunately, or fortunately perhaps, we have not reached the point of having to dissolve spiritual unions by decrees of the court, nor are persons who are merely spiritually married entitled to alimony from each other.

The young man says that he did have a conversation with the father, for he had been pretty attentive to the girl. I believe he went to see her every day or every other day, or three or four times a week, and each wrote to the other letters of the nature that I have characterized, and so the father on one occasion talked to Schwartz, not as if his daughter had been married to him, but to know what Schwartz intended with respect to his daughter. That was quite proper, quite in a fatherly spirit. The young man said: "Why, I am an honest man, I mean all right." That could be construed as the young man construed it: that he intended, after he got through college and established himself, to marry this girl, and that undoubtedly was the thought the girl had in mind when she referred to the letter of "Your Wifie of 1931."

It is further claimed that he wrote to her sister and signed the letter "Your brother in love." Just what that means I do not know. He did not say. "Your brother-in-law", but "Your brother in love." Now that might mean anything or nothing. Apparently it did not mean anything in this case. In all this record, long as it may be, there is not a single time when he introduced her as his wife, or called her by any other name than the name of Grossman. His letters to her were written Grossman. She signed her letters to him as Ann Louise Grossman. She seems to quibble about that on the witness-stand, but nowhere in this case, in all the record of the case, is there a single corroborative bit of proof that this man ever acknowledged this woman as his wife, or that she ever claimed him as her husband. She intimates that he came to her home at times and stayed late in the night. The father knows nothing about it. He says he was a working man and went to bed.

In so far as this record shows, these young persons were attracted to each other and intended at some time in the future to get married. Schwartz said he did not intend to get married and was not going to get married until after he had established himself in his profession and that was to be some time in 1931 or 1932, and that is corroborated by Ann Louise in the letter.

Now I do not know whether it is necessary to hold one out as his wife, in order to establish a relation of husband and wife created by common law, but I do know that that is pretty potent proof of the relation having been established, and the absence of it is pretty potent proof that no such relation was established.

In the case of James T. Duhigg v Elizabeth Duhigg, No. 10,422, decided December 23rd, 1929, the majority of this court held a common law marriage was established, but this member of the court dissented from that decision because there was nothing in that case which in his judgment could justify the holding of it to be a common law marriage, and yet that case is so infinitely stronger than the instant case that there is no comparison. There the relation between the so-called contracting parties started as illicit, and subsequently a child was born of the relationship and the alleged husband in that case took care of the child, and provided for the support of the woman and went to places with her and they lived together under the name of Dunn as husband and wife. He nowhere held her out as being Mrs. Duhigg, nor did he introduce her to anybody as Mrs. Duhigg, but he did go to a boarding house and cohabited with her as Mrs. Dunn. In that case, as already stated, a child was born who was thirteen or fourteen years old when she brought the suit. In the meantime Duhigg had married another woman by statutory marriage, but the majority of the court held that a common law marriage had been established between the plaintiff and the defendant in that case. I did not accede to that decision

then, nor do I now, but that case is so much stronger than the instant case that they are not to be compared.

In the instant case, in the first place, there is no agreement. In the second place, there is no proof of cohabitation following such agreement. In the third place, there is not a particle of evidence to show that he ever introduced her as his wife under his own name, nor any other name, nor is there a particle of proof that she was ever known as a married woman, either as his wife or anybody's wife, and there is nothing in the record to show any sexual relations between these parties. No child was born, nor is there any other overt thing to show such relationship, and Schwartz denies all such relationship. Whether true or not, it does not make much difference.

One would hardly think that a young woman who had any regard for her reputation would publish the shame that must come to her from the reading of these letters, for a paltry sum of ten dollars a week. She never made any claim to being Schwartz's wife other than through these gushing letters which I say started long before she claimed the marriage to have taken place.

But to give the utmost latitude to the words used by both of these parties, it falls far short of establishing the sacred relation of husband and wife. Why, the marriage as advocated by so many adherents to the loose marriage rite called companionate marriage, would be infinitely preferable than to have established a marriage created in such a loose way as the one in the instant case. One cannot establish the relation in that way. Ohio has gone as far as any state in recognizing a common law marriage. This member of the court has gone as far as any other court in holding there can be such a thing as a common law marriage. Ever since the decision in the case of Carmichael v State, 12 Oh St 553, that has been the rule, but to establish the relation, there must be clear and convincing evidence. Perhaps if there had been a written agreement, or a contract made in the presence of witnesses, that these persons had been married, proof of cohabitation following such agreement, even though there were no holding out, might be sufficient; but in all the cases that I have had anything to do with the plaintiff has relied upon a "holding out", to a more or less degree in establishing the marriage relation. In the case of Josephine Dirion v Nelson J. Brewer, Admr. of the Estate of Henry F. Scheips, 20 Oh Ap R 298, the Common Pleas Court held the relation was not that of marriage between the parties. This

court reversed that holding and held that there was a contract in that case which constituted a common law marriage with proof of such contract. In that case a young lady who was the offspring of the union between the man and woman was held to be the lawful heir of her father. He had said in many instances that this child was his. He bought a baby buggy and toasted her health for long life many times amongst his cronies. He had promised the sister that he would right the wrong that he did her sister and then said to her: "Didn't I do as I agreed, didn't I marry your sister?" After the man died he never having married anyone else, his brothers and sisters claimed the estate. This court held that the daughter Josephine was entitled to the estate; that she was a legitimate heir: that she was born of a common law marriage between the parties and that she was entitled to her father's estate. The Supreme Court refused to compel this court to certify its record in the case, which affirmed this court's ruling.

In the case of Mike Lumas v Julia Lumas, 26 Oh Ap R 502, this court held that the relation did not constitute a common law marriage. That case likewise was carried to the Supreme Court which overruled a motion to compel this court to certify its record. Much more did that case establish a common law marriage than this case.

In all these cases the basic principle was found in the 12 Oh St supra, that in order to constitute a common law marriage there must be a clear understanding and agreement to live together as husband and wife, and be to each other as husband and wife. That must be followed by cohabitation following immediately after the agreement. The agreement must be in praesenti, and not some time in the future. Then, if after that, the parties hold out each other as husband and wife, and the husband pays the bills for the wife, or has a charge account, or they are known as husband and wife, it does constitute a common law marriage, and then that marriage is just as lawful and just as binding as any other marriage. But to let down the bars and permit such conduct as these persons indulged in to be the basis of a common law marriage would be making a mockery of marriage, and be contrary to the policy of the State recognizing the sacredness of the marriage ties.

In this case the woman admits that she expected at some time in the future to be married by a Rabbi. If they were legally married as she claims, why be married again by a Rabbi? She says that was to satisfy his people. Her father was an Orthodox

Jew and he apparently did not think that there was anything other than the relation of lovers or sweethearts existing between his daughter and the defendant below, and he had that in mind when he spoke to the young man who assured him he was honest and meant all right. The father does not corroborate the daughter in any way as to cohabitation or a holding out.

Another thing: Ann Louise brought a suit against Schwartz's parents for alienation of affections and filed her petition in the Common Pleas Court, which is still pending in the Common Pleas Court. In that petition she says this marriage took place on the 15th of March, 1929, a whole year later. Well, she has not corrected that yet, although now she says that is a mistake. She has something in mind about the 15th of March. Well, that was Schwartz's birthday and probably spoke of it and so she claims that a marriage contract was entered into that day.

Where did they cohabit? How frequently did they cohabit? Where is the evidence to substantiate anything she says, for one must remember that as to what she says Schwartz said to the doctor in Chicago,— and his testimony is not obtained; nobody's testimony is obtained,—it is simply her statement which he denies, and he explains why he took her to this physician, that she was under weight and he wanted to get an expert opinion from one of the Rush Medical School doctors who was an expert upon the subject. Another physician she mentioned she visited to have something done to her nose. She does not deny that. She says he told the doctor that she was his wife and that he introduced her as such; but according to his testimony she went there as Miss Grossman and that the record of the hospital would show that a Miss Grossman was treated, which would dispute her claim, if the witnesses were brought to testify.

In the whole record there is nothing to corroborate a thing she says. On the contrary, he denies it. To establish a common law marriage there must be clear and convincing proof, or there must be a holding out, from which proof could be deduced. Here there is nothing of the kind. When this young woman understood that this young man's father and mother were financially responsible, she brought an alienation suit and then sought to establish the relation of husband and wife through her alimony suit.

We think from the record that this case ought to be reversed and that a final judgment ought to be entered for the plaintiff in error.

Reversed and final judgment for plaintiff in error, for the reason that there is no evidence to show a common law marriage.

WEYGANDT, J, concurs in the judgment.

LEVINE, J, concurs in the judgment of reversal, but not in the entry of final judgment.